**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Marcel Behnen, being duly sworn, depose and state that:

**Introduction**

1.      I am a Task Force Officer with the United States Drug Enforcement Administration ("DEA"), United States Department of Justice, and have been so employed since March 2019.  I have been a police officer with the Kalamazoo Department of Public Safety for about 12 years, the last 4 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team ("KVET"), which is tasked with investigating narcotics trafficking.  I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division.

2.      During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications.  Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation

of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

3.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic device and its contents:  one Grey Apple iPhone 11 Pro Max, unknown Model, unknown IMEI, with no case, also described in Attachment A (hereinafter the "**Subject Device**"). This item was seized from Semaj WILLIAMS on March 13, 2021 and is currently in the custody of KVET in Kalamazoo, MI.

4.      The applied-for warrant would authorize the forensic examination of the **Subject Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

5.      I respectfully submit that there is probable cause to believe that Semaj WILLIAMS has engaged in the distribution of, and in the possession with intent to distribute, crystal methamphetamine and crack cocaine, in violation of 21 U.S.C § 841(a)(1). I further submit that there is probable cause to believe that evidence of this offense will be found on the **Subject Device**.

6.      The facts in this Continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses.  This Continuation is intended to show merely that there is sufficient probable cause for the requested search of the **Subject Device** and does not set forth all of my knowledge about this matter.

## Probable Cause

7.      On March 13, 2021, Kalamazoo Department of Public Safety ("KDPS") Officer Colin Morgan observed a silver sedan parked in front of 935 Princeton Avenue in Kalamazoo.  Based upon his experience, Officer Morgan knew this residence to be a location from which methamphetamine is routinely sold.  Officer Morgan saw the vehicle pull out from in front of the residence without using a blinker, followed the vehicle (subsequently identified as a silver Dodge Avenger), and, after identifying the license plate (Michigan registration "ELLIS42"), conducted a traffic stop at North Rose Street and Darden Court in Kalamazoo, MI for the vehicle not having valid insurance on file.

8.      While Officer Morgan was talking to the driver, K.E., he was able to identify WILLIAMS, who he knew from previous police encounters.  Officer Morgan also noted that the other backseat passenger, P.B., appeared nervous, was avoiding eye contact, and was fidgeting with her handbag.  At that time, Officer Morgan asked K.E. to step out of the vehicle so he could speak with her privately. K.E. then told Officer Morgan they were coming from Summit Park Apartments (not the residence on Princeton Avenue), where she lives and had also stopped at her dad's house on

Princeton Avenue (not number 935).  When Officer Morgan confronted K.E. with the fact that he had seen her parked in front of 935 Princeton, K.E. changed her story, admitted parking in front of 935 Princeton, and told officers that, while they had been there, WILLIAMS had gone inside briefly.

9.      During the course of the traffic stop, Officer Morgan requested a KDPS police K-9 to respond to the location to conduct a free air search of the vehicle. Officer Chris Rieser and his K-9 partner, Murphy, arrived, conducted the free air search, and "alerted" to the odor of narcotics at the passenger's side door seams. Inside the vehicle, K-9 Murphy alerted again, this time to the rear bench seat and passenger seat floorboard behind the front passenger seat (where WILLIAMS had been seated).

10.     Prior to the K-9 arriving on scene, Officer Morgan told K.E. that there would be a search of the vehicle if the K-9 alerted. K.E. then made the statement "is it going to be on me?" Officer Morgan asked K.E. if there was something of concern in the vehicle, and K.E. responded "Yes" and stated it would be the property of the backseat passengers. K.E. then told officers she believed WILLIAMS had just purchased methamphetamine inside 935 Princeton Ave. and left it in her vehicle as officers were removing the vehicle's occupants. KE. also stated she knew WILLIAMS to be a current methamphetamine dealer.

11.     KDPS Officer Allison Mistretta had also responded to the traffic stop to assist Officer Morgan. Officer Mistretta observed WILLIAMS to be recording the traffic stop with the **Subject Device** in this hand. While observing the passengers from the passenger side of the vehicle, Officer Mistretta also observed WILLIAMS

reach down between his feet to the floorboard and then quickly put his hand back in lap and continue recording the traffic stop.

      12.     Following the above events, during the search of the vehicle, Officer Morgan located:

      a.     Baggie of suspected crack cocaine in a child's shoe on the backseat floorboard on the passenger's side. (KDPS Crime lab tested positive for .98 grams of cocaine base)

      b.     Plastic baggie with suspected methamphetamine located on the floorboard on the backseat passenger's side. (KDPS Crime lab tested positive for 69.90 grams of methamphetamine).

      c.     Two ripped portions of a plastic shopping bag with suspected methamphetamine residue inside them.

I know, based upon my training and experience, that the quantity of methamphetamine in particular is indicative of drug distribution rather than personal use. I also know that the ripped portions of the shopping bag are indicative of efforts by drug traffickers to package drugs for quick resale.

      13.     Officer Morgan noted that the above items were located at the feet of WILLIAMS and not within arm's reach of the other occupants. Additionally, they were not accessible by the front seat passenger due to a partition under the seat.

      14.     WILLIAMS was detained following the discovery of the suspected methamphetamine and crack cocaine where he was seated. WILLIAMS was Mirandized and interviewed. WILLIAMS denied any involvement in the sale of narcotics.

15.     WILLIAMS was initially arrested on State of Michigan charges of possession with intent to deliver methamphetamine[1]. During a search of his person, incident to arrest, Officer Morgan located **the Subject Device** on WILLIAMS' person.

16.     Based on my training and experience, I know that drug traffickers frequently use cell phones to conduct their drug trafficking business. For example, I have encountered drug dealers that use one cell phone/phone number to communicate with their suppliers, and a separate cell phone/phone number to communicate with their customers. I have also encountered drug dealers who use one cell phone/phone number for certain customers and co-conspirators with whom they have long-standing relationships that the drug dealers believe are more trustworthy, and a separate cell phone/phone number to communicate with lesser known and lesser trusted customers.

17.     Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

      a.    Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

      b.    Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

---

[1] Due to Covid-19 Arrest and Incarceration protocols at the Kalamazoo County Jail, WILLIAMS was denied lodging and released on scene.

c.      Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

d.      Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

e.      It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers.  These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

f.      That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

g.      User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

h.      Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

### Technical Terms

18.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while

9

other computers have dynamic—that is, frequently changed—IP addresses.

19.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the **Subject Device** has capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## Electronic Storage and Forensic Analysis

20.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

21.     *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Device** was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Subject Device** because:

    a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Device** consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23.   *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I

submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

24.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Device** described in Attachment A to seek the items described in Attachment B.